CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

DEC 1 5 2008

JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | |
|---|---|
| JANET MOORE , for A.P., <br> a minor child, <br>            Plaintiff, <br><br> v. <br><br> MICHAEL J. ASTRUE, <br> Commissioner of Social Security, <br>            Defendant. | ) <br> )    Civil Action No. 7:07cv00411 <br> ) <br> ) <br> ) <br> ) <br> ) By:   Hon. Michael F. Urbanski <br> )        United States Magistrate Judge <br> ) |

### REPORT AND RECOMMENDATION

Plaintiff Janet Moore ("Moore"), mother of the minor child A.P., brought this action pursuant to 42 U.S.C. § 1383(c)(3), incorporating 42 U.S.C. § 405(g), for review of the Commissioner of Social Security's (hereinafter "the Commissioner") final decision denying her claim for child's supplemental security income (hereinafter "SSI") under Title XVI of the Social Security Act (hereinafter "the Act"). The case was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) for report and recommendation, and is before the court on cross motions for summary judgment. Having reviewed the record, and after briefing and oral argument, the case is ripe for decision. The undersigned reports that the Commissioner's decision was supported by substantial evidence and was legally correct. Accordingly, the undersigned recommends that defendant's motion for summary judgment be granted and that plaintiff's motion for summary judgment be denied.

### I.

Judicial review of a final decision regarding disability benefits under the Act is limited to determining whether the administrative law judge's ( hereinafter "ALJ") findings "are supported

by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990) (citing 42 U.S.C. § 405(g)). Accordingly, a reviewing court may not substitute its judgment for that of the ALJ, but instead must defer to the ALJ's determinations if they are supported by substantial evidence. Id. "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)) . Substantial evidence is not a "large or considerable amount of evidence," Pierce v. Underwood, 487 U.S. 552, 565 (1988), but it is "more than a mere scintilla of evidence [and] may be somewhat less than a preponderance." Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966). If the Commissioner's decision is supported by substantial evidence, it must be affirmed. 42 U.S.C. § 405(g); Hays, 907 F.2d at 1456.

A child under the age of eighteen is considered "disabled" for purposes of eligibility for child's SSI if he has a medically determinable physical or mental impairment which results in marked and severe functional limitations, and which has lasted or can be expected to last for a continuous period of at least twelve (12) months, or results in death. 42 U.S.C. § 1382c(a)(3)(C)(i). In determining eligibility for child's SSI on the basis of disability, a three-step sequential evaluation process is followed. 20 C.F.R. § 416.924.

First, it must be determined whether the child is engaging in substantial gainful activity ("SGA"). 20 C.F.R. § 416.924(b). Second, if the child is not engaged in SGA, then it must be determined whether the child suffers from a severe impairment, either singularly or as a combination of impairments. 20 C.F.R. § 416.924(c). Third, if the child suffers from a severe impairment or combination of impairments, it must then be determined whether the child's

impairment meets, medically equals, or functionally equals an impairment listed in Part A or Part B of Appendix 1 to Subpart P of Part 404 of Chapter 20 of the Code of Federal Regulations. 20 C.F.R. § 416.924(d).

Functional equivalence is defined as an impairment of listing-level severity, meaning the impairment must result in "marked" limitations[1] in two domains of functioning, or result in "extreme" limitations[2] in one domain. 20 C.F.R. § 416.926a(a). There are six domains of

---

[1] A "marked" limitation is defined by regulation as follows:

> We will find that you have a "marked" limitation in a domain when your impairment(s) interferes seriously with your ability to independently initiate, sustain, or complete activities. Your day-to-day functioning may be seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities. "Marked" limitation also means a limitation that is "more than moderate" but "less than extreme." It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean. The overall assessment of the claimant's ability to appropriately, effectively, and independently perform activities must be compared to the performance of other children of similar age who do not have impairments.

20 C.F.R. § 416.926a(e)(2)(i).

[2] An "extreme" limitation is defined by regulation as follows:

> We will find that you have an "extreme" limitation in a domain when your impairment(s) interferes very seriously with your ability to independently initiate, sustain, or complete activities. Your day-to-day functioning may be very seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities. "Extreme" limitation also means a limitation that is "more than marked." "Extreme" limitation is the rating we give to the worst limitations. However, "extreme limitation" does not necessarily mean a total lack or loss of ability to function. It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean.

20 C.F.R. § 416.926a(e)(3)(i).

3

functioning assessed in determining functional equivalence: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) ability to care for oneself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1).

## II.

Moore filed for SSI benefits for her son A.P. on October 2, 2003, alleging an onset date of September 1, 2003. After the claim was denied initially and upon reconsideration, Moore requested a hearing before an ALJ, who after the hearing also denied Moore's claim. Subsequently, the Social Security Administration Appeals Council denied Moore's request for review, which established the ALJ's decision as the final decision of the Commissioner. Moore then timely filed a civil complaint in the United States District Court of the Western District of Virginia.

In his written decision, the ALJ applied the three-step sequential evaluation process outlined above. First, he found that A.P. has not engaged in SGA since the alleged onset date. (Administrative Record (hereinafter "R.") 15, 24). Second, the ALJ found that A.P.'s seizure disorder, bipolar disorder, attention deficit disorder, and oppositional defiant disorder cause him more than minimal limitations in age-appropriate functions, resulting in a severe impairment. (R. 20, 24). However, the ALJ next determined that A.P.'s impairments do not satisfy the third evaluation step. The ALJ found that A.P.'s impairments do not meet or medically equal the criteria set forth for any listed impairment. (R. 20, 25). The ALJ then considered if A.P.'s impairments—individually or collectively—are functionally equivalent to a listing, considering the

4

six domains of functioning. Based on the record, the ALJ found A.P. has less than "marked" limitations in all six domains of functioning. (R. 21-25). Therefore, the ALJ concluded that A.P.'s impairments are not functionally equivalent to a listing, and that A.P. is not disabled. (R. 25).

At the present stage of the proceedings, Moore disputes the ALJ's determination that A.P. is not disabled. Specifically, Moore argues that the medical record establishes that A.P. has marked limitations in two domains–Domain One (acquiring and using information) and Domain Three (interacting and relating with others)–resulting in the functional equivalent of a listed impairment and, therefore, is disabled under the Act. (Pl.'s Mem. in Supp. of Summ. J. at 12-14).

### III.

As the ALJ found, the record shows that A.P. suffers from severe impairments due to his multiple medical conditions. However, substantial evidence supports the ALJ's determination that A.P.'s impairments do not meet or medically equal the criteria for any listed impairment.[3] And contrary to Moore's arguments, the record supports the ALJ's determination that A.P. does not suffer at least a "marked" limitation in any of the six domains of functioning.

### A. Domain One–Acquiring And Using Information

---

[3] Specifically, the ALJ considered whether A.P.'s impairments meet or medically equal the criteria for major motor seizure disorder, nonconvulsive epilepsy, mood disorder, oppositional defiant disorder (a personality disorder), or attention deficit hyperactivity disorder of the childhood listings, found in Part B of Appendix 1 to Subpart P of Part 404 of Chapter 20 of the Code of Federal Regulations. (R. 20).

5

Substantial evidence supports the AlJ's determination that A.P. has less than marked limitations in acquiring and using information.[4]  In this domain, the Commissioner must "consider how well [a claimant] acquire[s] or learn[s] information," and how well the information learned is used.  20 C.F.R. § 416.926a(g).  More specifically, adolescents such as A.P.[5]:

> should continue to demonstrate what you have learned in academic assignments (e.g., composition, classroom discussion, and laboratory experiments).  You should also be able to use what you have learned in daily living situations without assistance (e.g., going to the store, using the library, and using public transportation).  You should be able to comprehend and express both simple and complex ideas, using increasingly complex language (vocabulary and grammar) in learning and daily living situations (e.g., to obtain and convey information and ideas).  You should also learn to apply these skills in practical ways that will help you enter the workplace after you finish school (e.g., carrying out instructions, preparing a job application, or being interviewed by a potential employer).

20 C.F.R. § 416.926a(g)(2)(v).

Though A.P. experienced some difficulties in this domain after his alleged onset date, substantial evidence supports the ALJ's determination that any limitation is less than marked, and/or did not last nor is expected to last for at least 12 months.  As described in the ALJ's decision:

> The childhood disability evaluation form completed by State agency medical consultants on March 26, 2004, and affirmed July 27, 2004, indicated the claimant's seizure disorder and attention deficit hyperactivity disorder are severe impairments, but do not meet, medically equal or functionally equal the listings.  The child was assessed with no limitation in the domains of acquiring and using information, and moving about and manipulating objects; and less than marked

---

[4] The ALJ actually determined that A.P. suffers no limitations in this domain, which of course encapsulates "less than marked" limitations.

[5] A.P. was born on July 17, 1990, and was 15 years old at the time of the ALJ's decision.

limitations in the domains of attending and completing tasks, interacting and relating to others, caring for himself, and health and physical well-being.

R. 19 (citing R. 203-08) (emphasis added).[6]

In February 2004, A.P. was evaluated by Nancy E. Utz, a school psychologist "due to teacher concerns about his failure to complete assignments, lack of participation in class, general lack of effort, and failing grades." (R. 189). Dr. Utz administered a number of tests, including the Kaufman Brief Intelligence Test (hereinafter "K-BIT") and the Wide Range Achievement Test-3d. Ed. (hereinafter "WRAT-3"). On the K-BIT, A.P. scored within the average range on the vocabulary/verbal portion, and the borderline range of the non-verbal matrices portion.[7] (R. 190). His total IQ composition score was 82, placing A.P. in the low average range for students his age. (R. 190). On the WRAT-3, A.P.'s scores in reading and spelling were within the average range for his age group, while his math score was within the borderline range.[8] (R. 190). Dr. Utz assessed that "[o]verall . . . [A.P.'s] basic academic skills are within expected ranges

---

[6] Though Plaintiff is correct that the ALJ only specifically mentioned Moore's hearing testimony when concluding that A.P. has no limitations in Domain One, that testimony only "confirmed" other evidence discussed earlier in the ALJ's opinion. (R. 21).

[7] Dr. Utz noted that on the non-verbal portion, A.P. "was observed to take very little time and to make little effort to really try and figure out the right answers." (R. 190).

[8] Similar to the non-verbal section of the K-BIT, Dr. Utz observed that in the math section of the WRAT-3, A.P.:

seemed averse to making the mental effort to do simple calculations if they involved larger numbers. He simply omitted many of the items. When he was coaxed to go ahead and do them anyway, he was mostly successful. His low math score is judged to be due to lack of effort rather than to inability or lack of skills.

(R. 190).

7

given his measured intellectual ability. He certainly appears to have the requisite skills for doing satisfactory work at his grade level if he chose to make the effort." (R. 190).

A.P.'s psychiatric reports also indicate less than marked limitations in Domain One, and that any problems in this domain dissipated over time. In his initial evaluation by child psychiatrist Raymond Sattler on October 19, 2004, Dr. Sattler opined that A.P.'s "[a]ttention, concentration, and psychomotor activity were adequate" and assessed A.P. with a score of 55 on the Global Assessment of Functioning (hereinafter "GAF").[9] (R. 221). At this evaluation, Dr. Sattler added Risperdal to A.P.'s drug regimen. (R. 221). Dr. Sattler next saw A.P. on November 9, 2004 and opined that A.P.'s "[a]ttention, concentration, and psychomotor activity were normal," and assessed A.P.'s GAF at 65.[10] (R. 284). In particular, A.P.'s attention and concentration were reported to have improved. (R. 284). Similarly, at the January 18, 2005 session, Dr. Sattler opined that A.P.'s "[a]ttention, concentration, and psychomotor activity were normal," and noted that A.P.'s attention and concentration were "reported to be better." (R. 283). At this visit, Dr. Sattler assessed A.P.'s GAF at 70, and diagnosed A.P.'s bipolar disorder, attention deficit disorder, and oppositional defiant disorder to all be in remission. (R. 283). On July 5, 2005, Dr. Sattler continued to diagnose A.P.'s mental health conditions as in remission,

---

[9] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION (hereinafter "DSM-IV"), 32 (American Psychiatric Association (hereinafter "APA") 1994). A GAF of 51-60 indicates that the individual has moderate symptoms in functioning. Id.

[10] A GAF of 61-70 indicates that the individual has mild symptoms in functioning. DSM-IV, 32 (APA 1994).

8

and assessed his GAF at 75.[11] (R. 382). On November 1, 2005, child psychiatrist Stella Ndem also assessed A.P.'s conditions to be in remission, and evaluated his GAF to be 80. (R. 383).

By all accounts, A.P.'s academic performance improved with a new academic setting and more appropriate medical treatment. The evidence establishes that A.P. received failing grades for the seventh grade in the 2002-03, 2003-04, and 2004-05 school years. (R. 124, 444).[12] He eventually was promoted to the eighth grade because of progress shown after being placed in a special uplift program in 2005, which featured a small classroom setting. (R. 455). Dr. Sattler noted in late 2004 that A.P.'s "grades are coming up" (R. 284), and on January 18, 2005 that A.P. was "doing much better overall academically" in the uplift program. (R. 283). Moore testified that at the time of the hearing in November 2005, A.P. was "doing real good" in eighth grade, achieving "B's and C's." (R. 445, 454). Further, Moore reported she had not received any reports from school recently, and that A.P.'s principal thought that he was "doing good." (R. 454).[13]

---

[11] A GAF of 71-80 indicates that the individual has slight, temporary impairments in functioning. DSM-IV, 32 (APA 1994).

[12] The record reflects that A.P.'s failing grades correspond with high levels of tardiness and absenteeism. In the 2002-03 school year, A.P. missed 15 school days, and was tardy 58 times. (R. 124). In 2003-04, A.P. missed 28 school days, and was tardy 90 times. (R. 124). In 2004-05, A.P. missed 71 school days, and was tardy 38 times. (R. 124).

[13] Though completed after the ALJ's decision, the record also includes a February 9, 2006 questionnaire of A.P.'s eighth grade civics teacher, who reported seeing A.P. five days a week for an hour each day, and having done so for the past 21 weeks. (R. 409). According to the civics teacher, A.P. had no limitations in the domain of acquiring and using information. (R. 410).

9

Though there is clearly substantial evidence in the record to support the ALJ's determination that A.P. suffers less than marked limitations in Domain One, this is not to say that evidence to the contrary does not also exist. In her summary judgment brief, Moore cites negative reports from teachers, school officials, and medical professionals indicating difficulties in this domain. (Pl.'s Mem. in Supp. of Summ. J. at 12-13). However, "[i]n reviewing for substantial evidence, [courts] do not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the [ALJ]." Craig, 76 F.3d at 589 (emphasis added). Therefore, the presence of some conflicting evidence cannot compel the undersigned to recommend reversal of an ALJ's decision, when—as is the case here—it is supported by substantial evidence.

## B. Domain Three–Interacting And Relating To Others

Substantial evidence also supports the AlJ's determination that A.P. has less than marked limitations in interacting and relating to others. In this domain, the Commissioner must "consider how well [a claimant] initiate[s] and sustain[s] emotional connections with others, develop[s] and use[s] the language of [his] community, cooperate[s] with others, compl[ies] with rules, respond[s] to criticism, and respect[s] and take[s] care of the possessions of others." 20 C.F.R. § 416.926a(i). More specifically, adolescents such as A.P.:

> should be able to initiate and develop friendships with children who are your age and to relate appropriately to other children and adults, both individually and in groups. You should begin to be able to solve conflicts between yourself and peers or family members or adults outside your family. You should recognize that there are different social rules for you and your friends and for acquaintances or adults. You should be able to intelligibly express your feelings, ask for assistance in getting your needs met, seek information, describe events, and tell stories, in all kinds of environments (e.g., home, classroom, sports, extra-curricular activities, or part-time job), and with all types of people (e.g., parents, siblings, friends, classmates, teachers, employers, and strangers).

20 C.F.R. § 416.926a(i)(2)(v).

Again, though A.P. experienced some difficulties in this domain after his alleged onset date, substantial evidence supports the ALJ's determination that any limitation is less than marked, and/or did not last nor is expected to last for at least 12 months. As noted supra, "the childhood disability evaluation form completed by State agency medical consultants on March 26, 2004, and affirmed July 27, 2004, indicated . . . . less than marked limitations in the domain[] of . . . interacting and relating to others. (R. 19).[14] In addition, a February 24, 2004 sociocultural assessment by visiting teacher/social worker Sophie Perrin indicated that A.P. "seems to like school and seems to get along with teachers and most classmates." (R. 186). While preferring time alone, Ms. Perrin's assessed that A.P. "sometimes likes to play with others, preferably older children. . . . [and] is said to have 1 friend." (R. 186).[15] Similarly, at the November 21, 2005 ALJ hearing Moore testified that although A.P. does not have friends in the neighborhood, he did ride bikes and play video games with his cousin. (R. 451).

At the administrative hearing, Moore also testified that A.P.'s behavior had improved after his medication was adjusted. She said that A.P. "still snaps every once in a

---

[14] This evaluation did note that A.P. had been suspended for fighting and that teachers had offered to help, but that A.P. did not seem to care. (R. 205). Also, it appears to have been based primarily upon a December 18, 2003 teacher questionnaire filled out by Lynn Meador, A.P.'s seventh grade math teacher for the 2003-04 school year. (R. 102-09). Out of the nine activities that Ms. Meador felt she had adequate knowledge upon which to base an opinion, she rated A.P. as having no problem in one, a slight problem in five, an obvious problem in two, and a serious problem in one (using adequate vocabulary and grammar to express thoughts/ideas). (R. 105).

[15] To be sure, this assessment did document some difficulties that A.P. had in Domain Three, most notably in his interactions with family members. (R. 186).

11

while, but he has to be pushed a little bit more to get madder." (R. 450). According to

Moore, A.P. had not exploded in anger for "a while," with the last incident happening

"[a]bout three months ago." (R. 450). This testimony corroborates contemporaneous

doctor's notes after Dr. Sattler prescribed Risperdal for A.P in October 2004. In his

November 29, 2004 report, A.P.'s neurologist Dr. James Wilson, III stated that

A.P."show[ed] a very gratifying response with the addition of Risperdal" and that he and

Moore were "both pleased with his present stability of mood, lack of disruptive behaviors,

and overall performance." (R. 308). Further, A.P.'s psychiatric reports from Dr. Sattler

and Dr. Ndem indicate improved mood and behavior after the medication adjustment. At

his initial visit on October 19, 2004, Dr. Sattler assessed that A.P. was experiencing

"recent worsening mood symptoms, with frequent irritability and abrupt changes in mood

and behavior." (R. 221). At his next visit on November 9, 2004, Dr. Sattler opined that

A.P. was "doing considerably better overall on his current regimen." (R. 284). A.P. was

evaluated as "alert, cooperative, well kempt, and [that he] interacted appropriately during

the visit." (R. 284). It was also reported that A.P.'s behavior was said to be better, with

his mood being described at "7/10." (R. 284). Moore "note[d to Dr. Sattler] that there is a

little back talking intermittently, especially when home, but no further aggressive

behaviors at all." (R. 284). The progress continued on January 18, 2005, as it was

reported to Dr. Sattler that A.P.'s "[b]ehavior is much better, and he is far less aggressive

than he had been. His mood is mostly happy and level." (R. 283). Similar positive

12

reports were created for A.P.'s July 5, 2005 (R. 382) and November 1, 2005 (R. 383) psychiatric visits.[16]

In her summary judgment brief, Moore cites evidence of A.P.'s behavioral and social problems (some from the same sources referenced above). Again, the presence of some conflicting evidence cannot compel the undersigned to recommend reversal of the ALJ's finding that A.P. suffers less than marked limitations in Domain Three, as that determination is clearly supported by substantial evidence.

### C. A.P. Does Not Suffer A Marked Limitation In Any Other Domain

Though the plaintiff only challenges the ALJ's decision with respect to Domains One and Three, the undersigned also finds that substantial evidence supports the ALJ's determination that A.P. suffers less than a marked limitation in Domains Two, Four, Five, and Six.

### Domain Two–Attending And Completing Tasks

In this domain, the Commissioner must "consider how well [a claimant is] able to focus and maintain [his] attention, and how well [he] begin[s], carr[ies] through, and finish[es his] activities, including the pace at which [he] perform[s] activities and the ease with which [he] change[s] them." 20 C.F.R. § 416.926a(h). More specifically, adolescents such as A.P.:

> should be able to pay attention to increasingly longer presentations and discussions, maintain your concentration while reading textbooks, and independently plan and complete long-range academic projects. You should also be able to organize your materials and to plan your time in order to complete

---

[16] The February 9, 2006 questionnaire of A.P.'s eighth grade civics teacher also indicated that A.P. had no problems in Domain Three. (R. 412).

13

school tasks and assignments. In anticipation of entering the workplace, you should be able to maintain your attention on a task for extended periods of time, and not be unduly distracted by your peers or unduly distracting to them in a school or work setting.

20 C.F.R. § 416.926a(h)(2)(v).

Though A.P. experienced some difficulties in this domain after his alleged onset date, substantial evidence supports the ALJ's determination that any limitation is less than marked, and/or did not last nor is expected to last for at least 12 months. As noted supra, "the childhood disability evaluation form completed by State agency medical consultants on March 26, 2004, and affirmed July 27, 2004, indicated . . . . less than marked limitations in the domain[] of attending and completing tasks. (R. 19). In addition, while it is documented that A.P. had a short attention span (see, e.g., R. 188), this limitation was insufficient to qualify A.P. for special education and/or related services. (R. 198-202). Moreover, as detailed supra, after Dr. Sattler adjusted A.P.'s medication in October 2004 to include Risperdal, his attention and concentration markedly improved. (R. 221, 284, 283, 382, 383).[17] Therefore, substantial evidence clearly supports the ALJ's finding that A.P. has less than marked limitations in Domain Two.

### Domain Four–Moving And Manipulating Objects

In this domain, the Commissioner must "consider how [a claimant] move[s his] body from one place to another and how [he] move[s] and manipulate[s] things." 20 C.F.R. § 416.926a(j). More specifically, adolescents such as A.P.:

---

[17] The February 9, 2006 questionnaire of A.P.'s eighth grade civics teacher also indicated that A.P. had only slight problems with respect to activities relevant to Domain Two. (R. 411).

14

should be able to use your motor skills freely and easily to get about your school, the neighborhood, and the community. You should be able to participate in a full range of individual and group physical fitness activities. You should show mature skills in activities requiring eye-hand coordination, and should have the fine motor skills needed to write efficiently or type on a keyboard.

20 C.F.R. § 416.926a(j)(2)(v).

The record confirms the ALJ's determination that any limitation in Domain Four was less than marked, and/or does not satisfy the duration requirement.[18] As noted supra, "the childhood disability evaluation form completed by State agency medical consultants on March 26, 2004, and affirmed July 27, 2004, indicated no limitation in the domain[] of . . . manipulating objects. (R. 19). Further, the record establishes that A.P. plays with others (R. 186), rides and works on bikes (R. 187, 284), plays video games (R. 186), and works with model cars (R. 314).[19] Accordingly, substantial evidence supports the ALJ's determination that A.P. has less than marked limitations in Domain Four.

### Domain Five–Ability To Care For Oneself

In this domain, the Commissioner must "consider how well [a claimant] maintain[s] a healthy emotional and physical state, including how well [he] get[s] [his] physical and emotional wants and needs met in appropriate ways; how [he] cope[s] with stress and changes in [his] environment; and whether [he] take[s] care of [his] own health, possessions, and living area." 20 C.F.R. § 416.926a(k). More specifically, adolescents such as A.P.:

---

[18] To be precise, the ALJ found that A.P. had no limitations in Domain Four. (R. 24).

[19] The February 9, 2006 questionnaire of A.P.'s eighth grade civics teacher also indicated that A.P. had no limitations in Domain Four. (R. 413).

15

should feel more independent from others and should be increasingly independent in all of your day-to-day activities. You may sometimes experience confusion in the way you feel about yourself. You should begin to notice significant changes in your body's development, and this can result in anxiety or worrying about yourself and your body. Sometimes these worries can make you feel angry or frustrated. You should begin to discover appropriate ways to express your feelings, both good and bad (e.g., keeping a diary to sort out angry feelings or listening to music to calm yourself down). You should begin to think seriously about your future plans, and what you will do when you finish school.

20 C.F.R. § 416.926a(k)(2)(v).

The record certainly indicates that A.P. experienced difficulties in this domain, but that any limitation is less than marked, and/or did not last nor is expected to last for at least 12 months. A.P. appeared "sluggish" and "drowsy" to Dr. Wilson in his initial evaluation on September 19, 2003, though Moore reported this to be abnormal and attributed it to A.P. staying up late the night before. (R. 153). In December 2003, Ms. Meador rated A.P. as having obvious problems in four activities relevant to Domain Five, and slight problems in two activities. (R. 107). She also reported that A.P. slept in class, looked disheveled, and tended to appear dazed. (R. 107). School records in February and April 2004 reference A.P.'s explosive behavior. (R. 185, 201).[20] Most troubling though are notes from A.P.'s May 28, 2004 visit with Dr. Wilson:

> Recently he has been playing with fire, lighting strings, and burning animals. He has made several statements of potentially harming himself. Specifically he has reported thinking about riding his bike in front of a car hoping he will be hit. He continues to act out at school and has been suspended on several occasions.

---

[20] However, as described supra, "the childhood disability evaluation form completed by State agency medical consultants on March 26, 2004, and affirmed July 27, 2004, indicated . . . . less than marked limitations in the domain[] of . . . caring for himself. (R. 19).

16

(R. 211). At this point, Dr. Wilson adjusted A.P.'s medications, and strongly suggested a psychiatric referral to Dr. Sattler. (R. 211, 209-10). As detailed supra, after Dr. Sattler adjusted A.P.'s medication in October 2004 to include Risperdal, A.P.'s behavior "show[ed] a very gratifying response" and both he and Moore were "pleased with his present stability of mood, lack of disruptive behaviors, and overall performance." (R. 308; see also R. 221, 284, 283, 382, 383). The psychiatric notes from Dr. Sattler and Ndem also indicate that they never evaluated A.P. to be suicidal or homicidal. (R. 221, 284, 283, 382, 383). Moore also attested to A.P.'s behavioral improvement in the November 2005 hearing. (R. 450).[21] Accordingly, substantial evidence exists to support the ALJ's determination that A.P. has less than marked limitations in Domain Five, as the record is clear that A.P.'s showed dramatic improvement after beginning more appropriate medical treatment.

### Domain Six–Health And Physical Well-Being

In Domain Six, the Commissioner must "consider the cumulative physical effects of physical or mental impairments and their associated treatments or therapies on your functioning that we did not consider in [Domain Four]." 20 C.F.R. § 416.926a(l). Examples of limitations in this domain include, but are not limited to, generalized symptoms, somatic complaints, limitations in physical functioning caused by treatment, or the need to have excessive medical care to maintain a level of health and well-being. 20 C.F.R. § 416.926a(l)(4)(i)-(v). A finding of marked limitation in the sixth domain

---

[21] The February 9, 2006 questionnaire of A.P.'s eighth grade civics teacher also indicated that A.P. had no limitations in Domain Five. (R. 414).

17

may be made if a claimant is frequently ill because of his or her impairments. 20 C.F.R. §
416.926a(e)(2)(iv). "Frequent" is defined as "episodes of illness or exacerbation that
occur on an average of 3 times a year, or once every 4 months, each lasting 2 weeks or
more." Id. A finding of marked limitation may also be made if a claimant's episodes do
not occur as frequently as outlined above, or last as long, provided that the overall effect
of the episodes is equivalent in severity. Id.

A.P.'s medical record evidences a history of seizures, but that his condition
improved over time with treatment and does not rise to the level of a marked limitation as
defined by regulation. A.P. suffered a major motor seizure at school on September 2,
2003. (R. 145-46, 168-73, 253-58). He was discharged from the hospital the next day,
and cleared to immediately return to school. (R. 148). An electroencephalogram
(hereinafter "EEG") showed "a low threshold for seizures, partial or secondary generalized
type." (R. 148). Dr. Wilson saw A.P. for a follow-up appointment on September 19, 2003
and reported that the his clinical history indicated a secondarily generalized seizure
disorder, with intermittent staring spells also being reported. (R. 153).

On November 2, 2003, A.P. suffered a grade-2 liver laceration in a bike accident.
(R. 141). Dr. Wilson attributed the accident to a seizure while A.P. was riding his bike.
(R. 218). A.P. was hospitalized for four days, and did not return to school (though he
received home-bound instruction) until at least November 24, 2003. (R. 143, 240-41,
238). During his hospital stay, another abnormal EEG indicated a potentially lowered
threshold for seizures. (R. 246). Dr. Wilson subsequently adjusted A.P.'s medication. (R.
218).

A.P. underwent a sleep-deprived EEG on February 19, 2004. The results were abnormal, and continued to indicate a potentially lowered threshold for seizures. (R. 214). Dr. Wilson adjusted A.P.'s medication again. (R. 215). On May 28, 2004, Dr. Wilson adjusted A.P.'s medication again, including increasing the dosage of Topamax. (R. 212). At A.P.'s August, 30, 2004 visit, Dr. Wilson noted that "the increase of Topamax . . . has been met with seizure control." (R. 209) (emphasis added). This improvement was confirmed at A.P.'s November 29, 2004 visit, where Dr. Wilson noted that "[h]e has had no evidence of recurrent seizures." (R. 308).

During a May 31, 2005 visit with Dr. Wilson, A.P. did report a seizure that occurred in January 2005. Dr. Wilson noted the "improvement in the seizures with the Topamax as well as some improvement in the headaches," and increased A.P.'s dosage of Topamax once again. (R. 306-07). At a July 19, 2005 follow-up, A.P.'s headaches had improved, but Moore and A.P. also reported intermittent recurrence of staring spells, intermittent dizziness in the morning, and muscle jerks and twitches when quiet. (R. 304). Another sleep-deprived EEG was ordered for September 1, 2005, and the results were almost identical to the one performed in 2004. (R. 304, 302). Despite the presence of a lowered threshold for seizures, Dr. Wilson stated that day that there was "no evidence of an ongoing seizure in spite of prolonged hyperventilation effort with the test." (R. 302). Moore did report a seizure-like event on August 16, 2005, but "[t]his is the only episode

Case 7:07-cv-00411-SGW-mfu    Document 19    Filed 12/15/08    Page 19 of 21    Pageid#: 83

which has been consistent with seizure activity." (R. 302).[22] Dr. Wilson also opined that A.P.'s "intermittent staring spells do not appear to be epileptic in character." (R. 302).[23]

In summary, though A.P. has a history of seizures beginning in September 2003, the record shows that his neurologist soon brought the problem under control after adjusting A.P.'s medication. Substantial evidence thus clearly supports the ALJ's determination that A.P. has less than marked limitations in Domain Six.

## IV.

For the foregoing reasons, the undersigned recommends that plaintiff's motion for summary judgment be denied and defendant's motion for summary judgment be granted.

In making this recommendation, the undersigned does not suggest that A.P. does not experience some limitations. However, the objective record simply fails to document the existence of "marked" limitations in two domains of functioning, or "extreme" impairment in one domain. It appears the ALJ properly considered all of the objective and subjective evidence in adjudicating Moore's claim for SSI on behalf of her son. It follows that all facets of the Commissioner's decision are supported by substantial evidence in this case.

---

[22] At the ALJ hearing, Moore's testimony corroborated A.P.'s history of seizures as reflected in Dr. Wilson's medical notes. She testified regarding A.P.'s seizures in September 2003, November 2003, January 2004, and then "a couple of other ones but nothing that he's been kept in the hospital for." (R. 446-47).

[23] At the hearing, Moore described staring spells as "little" seizures, but acknowledged the episodes could also merely be concentration issues. (R. 448). She also testified that A.P. had not complained of headaches "since the Topamax." (R. 449).

The Clerk is directed immediately to transmit the record in this case to the Hon. Samuel G. Wilson, United States District Judge. Both sides are reminded that pursuant to Federal Rule of Civil Procedure 72(b)(2) they are entitled to note any objections to the Report and Recommendation within ten (10) days hereof. Any adjudication of fact or conclusion of law rendered herein by the undersigned not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitation or findings as well as to the recommendations reached by the undersigned may be construed by any reviewing court as a waiver of such objection.

The Clerk of the Court hereby is directed to send a certified copy of this Report and Recommendation to all counsel of record.

Enter this _15_ day of December, 2008.

Michael F. Urbanski
United States Magistrate Judge

21